[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12237

_____

D.C. Docket No. 0:12-cv-60654-FAM

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

Plaintiff-Appellant,

versus

AMERIJET INTERNATIONAL, INC.,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 23, 2015)

Before HULL and JULIE CARNES, Circuit Judges, and ROTHSTEIN,[*] District Judge.

ROTHSTEIN, District Judge:

Plaintiff-Appellant International Brotherhood of Teamsters ("IBT") filed this case in the United States District Court for the Southern District of Florida, seeking, *inter alia*, to compel arbitration of two different sets of grievances arising from disputes with Defendant-Appellee Amerijet International, Inc. ("Amerijet"). The district court found that it lacked subject-matter jurisdiction over IBT's claims and granted Amerijet's motion to dismiss Counts I, II, and III of IBT's complaint. This appeal followed.

IBT challenges (1) the district court's determination that it lacked subject-matter jurisdiction to compel arbitration of nine deadlocked grievances because they were "minor disputes" under the terms of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*. (Count I), and (2) the district court's determination that the RLA cannot be applied extraterritorially and, therefore, that it lacked subject-matter jurisdiction to compel arbitration of the grievances arising out of Amerijet's operations in Port of Spain, Trinidad (Counts II and III).

After a careful review of the briefs and the record, and with the benefit of

---

*Honorable Barbara J. Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

oral argument, we reverse the district court's dismissal of Counts I, II, and III of IBT's complaint and remand them to the district court for further proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

Review of a district court's determination of its own subject-matter jurisdiction is *de novo*. *Calderon v. Baker Concrete Constr., Inc.*, 771 F.3d 807, 810 (11th Cir. 2014). In addition, the district court's application of the RLA is reviewed *de novo*. *See CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1320 (11th Cir. 2003) ("The district court's classification of a dispute as major or minor under the RLA is a question of law we review *de novo*.").

To survive a motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). At the motion to dismiss stage, the court must accept the factual allegations contained in the complaint as true and must construe them in the light most favorable to the non-moving party. *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1344-45 (11th Cir. 2011).

## II. THE DISTRICT COURT ERRED IN FINDING THAT IT LACKED JURISDICTION TO COMPEL ARBITRATION OF THE NINE DEADLOCKED GRIEVANCES

### A. Factual Background

### 1. The Parties and the CBAs

IBT is a labor union that is the exclusive representative of Amerijet's pilots and flight engineers. Amerijet is a cargo airline and common air carrier subject to the provisions of the RLA. IBT and Amerijet are governed by two collective bargaining agreements ("CBAs") that concern, respectively, Amerijet's pilots and flight engineers. The CBAs are identical in all terms relevant to this case.

The CBAs contain grievance procedures for resolving disputes between the parties. The CBAs first contemplate an "informal discussion." If a grievance is not resolved through informal discussion, Step 1 of the formal grievance process is an appeal to the Chief Pilot, which must be submitted within fourteen days following receipt of a disciplinary notice or a violation of the CBAs.[1] The Chief Pilot must issue a written decision within fourteen days of receipt of the grievance.

A grievance may next proceed to Step 2, the appeals process.[2] If the Chief Pilot's decision is not satisfactory to an employee, the employee may first appeal

---

[1] Grievances both by engineers and by pilots are initially submitted to the Chief Pilot.

[2] Although the CBAs refer to an "appeal" to the Chief Pilot as the first part of the formal process in Step 1, the CBAs entitle Step 2 as "Appeals."

the decision to the Director of Operations. The appeal "must be submitted by an accredited Union representative within ten (10) calendar days of receipt of the decision rendered by the Chief Pilot." If the decision rendered by the Director of Operations is unsatisfactory, the employee may further appeal to the Vice President of Human Resources. The appeal "must be submitted by an accredited Union Representative within ten (10) calendar days of receipt of the decision rendered by the Director of Operations."

If an earlier step does not resolve the dispute, at Step 3 "the Union may forward the appeal in writing" to the Systems Board of Adjustments (the "Systems Board") "within thirty (30) days of its denial at the previous step." The Systems Board is comprised of one member selected by Amerijet and one member selected by IBT. If the Systems Board is unable to agree to a finding, one final step remains: "[T]he Union may appeal the grievance to Arbitration within thirty (30) calendar days following notification of the deadlock."

### 2. The "Set of Nine" Deadlocked Grievances

In early 2010, IBT filed a series of grievances against Amerijet and advanced them through the grievance procedures set out in the CBAs. The Systems Board deadlocked on nine of the grievances (the "Set of Nine") in March, 2011. On April 6, 2011, David Renshaw, IBT's representative on the Systems

Board, sent an e-mail entitled "System Board Decision - March 2011." The e-mail was addressed to seven individuals, including Derry Huff, Amerijet's Board Representative; Isis Suria, Amerijet's Vice President of Human Resources; and Daisy Gonzalez and John Kunkel, two Union representatives. In the e-mail Renshaw listed the nine deadlocked grievances (among others) and after each grievance wrote "**deadlocked-proceed to arbitration**" (emphasis in original). Huff, Amerijet's Board Representative, responded by e-mail the same day. In his e-mail to Renshaw,[3] Huff asked, "Also, as members of the system board, must we direct that a case is to proceed to arbitration? I think it's our job to simply rule on the cases . . . . [A] proclamation to 'proceed to arbitration' I think sends the message that it must (or should) be done when in fact I think all parties are leaving our sessions with much to think about."

Later that same day, Gonzalez, IBT's business agent, responded to all persons on Renshaw's e-mail and asked Suria, Amerijet's Vice President of Human Resources, "When can we expect the filing for arbitration on the deadlocked cases?" Huff forwarded Gonzalez's e-mail to Renshaw[4] and stated, "My point exactly . . . . [I]s the IBT really taking all of these to arbitration?"

---

[3] Huff did not include any other recipients on the e-mail.

[4] Again, Huff did not include any other recipients on the e-mail.

No further e-mails were sent until June 2, 2011, when John Kunkel, Gonzalez's successor as IBT's business agent, sent an e-mail to Amerijet's Suria, noting that Amerijet had failed to advance the cases to arbitration. Gonzalez also wrote to Suria on June 2, 2011, stating "[t]o date we have not received an arbitration panel for the cases that were deadlocked at the March, 2011 System Board. These arbitration panels were requested via e-mail by David Renshaw on April 6th." Gonzalez listed the nine cases and asked Suria to "[p]lease advise."

Suria responded to Kunkel's and Gonzalez's correspondences on June 7, 2011, by e-mail. In her e-mail, Suria stated that "[t]he union did not appeal any grievance to arbitration from the last Systems Board. . . . [T]he union was required to separately advise the company within 30 days following notification of the System Board's deadlocks . . . . No notice from the union was provided to the company within 30 days . . . ." Suria stated that Renshaw's e-mail of April 6, 2011, was not sufficient notice because Renshaw's e-mail "was written notice from the System[s] Board of the System[s] Board's decision[]," which Suria opined was "not an appeal by the union to arbitration . . . because the System[s] Board can't act on behalf of the union but can only act for itself." Therefore, Amerijet did not advance the Set of Nine grievances to arbitration, and Suria

7

stated that "[a]ny attempt by the union to appeal to arbitration now . . . would be untimely."

## B.  Procedural Background

IBT filed this lawsuit in the district court, seeking, *inter alia*, to have the court compel the arbitration of the Set of Nine grievances.  In Count I of the complaint, IBT asked the district court to order Amerijet to advance the Set of Nine grievances to arbitration.

According to IBT, it properly informed Amerijet of its intent to arbitrate the deadlocked grievances when, on April 6, 2011, its Systems Board representative sent an e-mail in which he listed the nine deadlocked grievances at issue and after each grievance wrote "**deadlocked-proceed to arbitration**" (emphasis in original).  In addition, later the same day, IBT representative Gonzalez sent an e-mail asking Suria, Amerijet's Vice President of Human Resources, "When can we expect the filing for arbitration on the deadlocked cases?"

Amerijet filed a "Motion to Dismiss Pursuant to Rule 12(b)(1) and (6) or, in the Alternative, for Summary Judgment."  First, Amerijet moved to dismiss Count I, pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the district court lacked subject-matter jurisdiction and the authority to compel arbitration.  Alternatively, Amerijet moved to dismiss Count I for failure to state a claim,

8

pursuant to Rule 12(b)(6), arguing that "IBT has failed to plead facts sufficient to demonstrate a plausible claim for relief, i.e., by pleading facts sufficient to show a right to have arbitration compelled as to the group of nine deadlocked grievances."

Finally, assuming that the district court had jurisdiction to compel arbitration, Amerijet moved for summary judgment, pursuant to Rule 56. Amerijet contended that "[t]he undisputed material facts establish that Amerijet has satisfied its responsibilities under the CBAs as the IBT did not pursue the issue of whether it properly advanced any of the deadlocked grievances to arbitration through the CBAs' dispute resolution mechanisms." Specifically, Amerijet argued that IBT "did not file [a] grievance or pursue the multi-step appellate grievance procedures in the CBA as necessary to obtain arbitration of this issue." Therefore, because it "has failed to exhaust the dispute resolution procedures in the CBA[,] . . . IBT is not entitled to arbitrate that dispute and summary judgment should be granted for Amerijet[,] denying Count I of the Complaint."

Both parties agreed that the merits of the nine grievances are arbitrable as minor disputes under the RLA and that the issue of whether IBT provided proper notice of its intent to proceed to arbitration (the "notice issue") is likewise a minor dispute.

9

Accepting those positions, the district court concluded that it did "not have jurisdiction to proceed further" by compelling arbitration "once it has been established that the notice issue" was a minor dispute subject to the dispute resolution procedures set out in the CBAs.  Accordingly, the district court ruled as follows:

> (1) Amerijet's Motion to Dismiss Pursuant to Rule 12(b)(1) and (6) or, in the Alternative, for Summary Judgment, filed on May 24, 2012, is GRANTED.
>
> (2) Counts I, II, and III of the IBT's complaint are dismissed for lack of subject matter jurisdiction.[5]

(Record citation omitted; emphasis omitted).

IBT timely appealed.

## C.  Analysis

On appeal, IBT contends that, although the district court may have lacked jurisdiction to rule on the merits of the grievances, it nonetheless had jurisdiction

---

[5] IBT's original complaint had six counts.  The district court dismissed Counts I, II, and III for lack of subject-matter jurisdiction, but dismissed Counts IV, V, and VI with leave to amend.  IBT then filed its first amended complaint, which included the same six counts.  Amerijet moved to strike Counts I, II, and III of the first amended complaint, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  The district court granted the motion to strike Counts I, II, and III of the first amended complaint "under Rule 12(f) as this Court has already dismissed the counts for lack of subject matter jurisdiction."  The district court subsequently resolved the remaining counts, and those counts are not at issue on appeal and are not relevant to our resolution of IBT's claims.  Because Counts I, II, and III were struck from the first amended complaint, all references to "the complaint" refer to IBT's initial complaint, filed on April 12, 2012.

10

and authority to compel Amerijet to arbitrate the grievances, where the arbitrator could consider the notice issue before turning to the merits of the grievances. IBT argues that the district court's order "dismissing Count I should be reversed" and Count I "remanded for entry of an order directing Amerijet to proceed to arbitration on the nine deadlocked grievances."

By contrast, Amerijet argues that the consequence of the notice issue being a minor dispute is that the district court lacked subject-matter jurisdiction to compel arbitration, and that the notice issue must be contested through a new and separate grievance process, as set out in the CBAs. Amerijet contends that the district court's dismissal of Count I should be affirmed. In its brief on appeal, Amerijet expressly argues that IBT "has failed to establish that the District Court had subject matter [jurisdiction] in fact and that an order compelling arbitration of the deadlocked grievances was mandated as a matter of law under the circumstances."

This Court has not had occasion to consider whether, pursuant to the RLA, a district court has the authority to compel arbitration where an employer refuses to arbitrate due to an alleged procedural failure on the part of a union or aggrieved party. In the absence of controlling circuit precedent, we turn to relevant Supreme Court decisions to guide us.

11

The parties' disagreement over whether IBT properly provided notice of its intent to arbitrate mirrors one of the issues addressed in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S. Ct. 909 (1964). In *Wiley*, a union and a publishing firm had a collective bargaining agreement covering 40 of the firm's approximately eighty employees. *Id.* at 545, 84 S. Ct. at 912. The publishing firm merged with another publisher, John Wiley & Sons ("Wiley"), which did not have any union-represented workers. *Id.* After the merger, the union contended that Wiley was obligated to recognize certain rights created by the collective bargaining agreement for the forty union-represented employees, and the union sought arbitration of those issues. *Id.* at 545-46, 84 S. Ct. at 912. However, Wiley asserted that the merger terminated the bargaining agreement for all purposes and that the company therefore was not bound to arbitrate under the collective bargaining agreement's arbitration provision. *Id.* The union then filed suit and moved to compel arbitration of the disputes over the recognition of the workers' rights. *Id.*

The district court denied the motion and refused any relief. *Id.* at 544, 84 S. Ct. at 912. The Second Circuit reversed and directed the district court to order arbitration. *Id.* The Supreme Court affirmed the Second Circuit's decision. *Id.*

12

The Supreme Court first concluded that a court, rather than an arbitrator, must decide whether Wiley was bound by the pre-existing collective bargaining agreement and, thus, the arbitration provision. *Id.* at 546-47, 84 S. Ct. at 912-13. The Supreme Court then held that Wiley was bound by the collective bargaining agreement and its arbitration provision. *Id.* at 550-51, 84 S. Ct. at 915.

Next, the Supreme Court considered whether the subject matter of the dispute was within the scope of the arbitration clause. *Id.* at 552-55, 84 S. Ct. at 916-17. The *Wiley* Court did not answer the question but merely held that the union's complaints were "not so plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction." *Id.* at 555, 84 S. Ct. at 917.

Finally, and most relevant to this case, the Supreme Court considered Wiley's contention that it had no duty to arbitrate, even if it was bound by the collective bargaining agreement, because the union failed to comply with the procedures established by the arbitration provision. *Id.* at 555-56, 84 S. Ct. at 917-18. The Supreme Court rejected Wiley's argument that the union's alleged procedural failure should prevent a federal court from compelling arbitration. *Id.* at 557, 84 S. Ct. at 918. The *Wiley* Court noted that "labor disputes of the kind

13

involved here cannot be broken down so easily into their 'substantive' and 'procedural' aspects." *Id.* at 556, 84 S. Ct. at 918.  The Supreme Court stated that "it best accords with the usual purposes of an arbitration clause and with the policy behind federal labor law to regard procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance procedures into play." *Id.* at 559, 84 S. Ct. at 919.  Accordingly, the *Wiley* Court concluded that, if the subject matter of an underlying dispute is arbitrable, "'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *Id.* at 557, 84 S. Ct. at 918.  The Supreme Court therefore affirmed the Second Circuit's order directing the district court to compel arbitration.  *Id.* at 559, 84 S. Ct. at 919.

We think the instruction of *Wiley* is clear:  Where, as here, an employer has refused to arbitrate a minor dispute based on an alleged failure by the union to comply with the procedures set forth in collective bargaining agreements, the district court ordinarily should compel arbitration of the dispute, with the procedural issue to be considered by the arbitrator.[6]

---

[6] Similar to the notice issue, the issue of whether IBT had to separately grieve and "exhaust" Amerijet's failure to arbitrate is a procedural issue for the arbitrator to decide under the relevant provisions of the CBAs.

14

We recognize that the *Wiley* Court did not address the basis for the district court's jurisdiction to compel arbitration—or even whether the dispute was a major dispute, a minor dispute, or something else altogether.  However, a review of the text of the RLA and case law indicates that federal courts maintain the authority to compel arbitration of minor disputes.

Amerijet correctly notes that, as a jurisdictional matter, the RLA prohibits federal courts from reaching the merits of minor disputes.  *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 304, 109 S. Ct. 2477, 2481 (1989) (stating that "any adjustment board under the RLA" has "exclusive jurisdiction over minor disputes"); *see also Empresa Ecuatoriana De Aviacion, S.A. v. Dist. Lodge No. 100*, 690 F.2d 838, 844 (11th Cir. 1982) ("A minor dispute must be submitted to compulsory arbitration by an adjustment board, which has exclusive jurisdiction to decide minor disputes." (citation and footnote omitted)).

At the same time, the RLA's provisions preventing federal courts from ruling on the merits of minor disputes do not leave the courts completely powerless.  Although federal courts lack the subject-matter jurisdiction to resolve the merits of minor disputes under the RLA, those courts maintain jurisdiction to enter orders required to ensure compliance with the procedures prescribed by the RLA for settling such disputes.  *See id.* ("Employees are forbidden to strike over

15

minor disputes, and the federal courts have jurisdiction to enjoin such strikes."

(citing *Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co.*, 353 U.S. 30, 77 S.

Ct. 635 (1957)).  Thus, a federal court has the authority to compel arbitration of a

minor dispute, even if it lacks the subject-matter jurisdiction to resolve the merits

of the minor dispute.  *See W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S.

1301, 1302, 107 S. Ct. 1515, 1515 (1987) (O'Connor, Circuit Justice, granting

application for stay) ("While courts lack authority to interpret the terms of a

collective-bargaining agreement, a court may compel arbitration of a minor

dispute before the authorized System Board.").

This conclusion accords with the Supreme Court's precedent in the context

of "major disputes" under the RLA.  Like with minor disputes, the merits of major

disputes under RLA generally are not to be resolved by federal courts.  Instead, the

RLA "established rather elaborate machinery for negotiation, mediation, voluntary

arbitration, and conciliation" of major disputes.  *Detroit & Toledo Shore Line R.R.

Co. v. United Transp. Union*, 396 U.S. 142, 148-49, 90 S. Ct. 294, 298 (1969); *see

also* 45 U.S.C. §§ 154, 155 (establishing the National Mediation Board and

authorizing it to resolve major disputes).[7]  Nonetheless, even where federal courts

---

[7] The Supreme Court has noted that the RLA "provides an exhaustively detailed
procedural framework to facilitate the voluntary settlement of major disputes," and the
"effectiveness of these private dispute resolution procedures depends on the . . . assurance that

lack subject-matter jurisdiction under the RLA to resolve major disputes, district courts "have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures." *Consol. Rail Corp.*, 491 U.S. at 303, 109 S. Ct. at 2480.

In addition, recognizing federal courts' limited authority to compel arbitration of minor disputes furthers one of the stated purposes of the RLA by ensuring "the prompt and orderly settlement of all disputes growing out of grievances." 45 U.S.C. § 151a(5). Specifically, this outcome avoids the prospect of requiring the parties to engage in two separate disputes—one procedural, one substantive—before a labor dispute is resolved.

Accordingly, the district court erred in granting Amerijet's motion to dismiss Count I and in finding that it lacked subject-matter jurisdiction to compel arbitration. As explained above, IBT's complaint has pled undisputed facts sufficient to show a right to have arbitration of the Set of Nine deadlocked grievances compelled by the district court as a matter of law, with the procedural issues to be decided by the arbitrator.

---

neither party will be able to enlist the courts to further its own partisan ends." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 441, 109 S. Ct. 1225, 1234 (1989) (citation and quotation marks omitted).

## III.   THE DISTRICT COURT ERRED IN FINDING THAT IT LACKED SUBJECT-MATTER JURISDICTION OVER THE PORT OF SPAIN GRIEVANCES

### A.  Factual Background

Since 2008, rotating crews of IBT members have been temporarily assigned to work in Port of Spain, Trinidad,[8] at a facility established by Amerijet.  At all times since the establishment of the Port of Spain facility, all of Amerijet's crewmembers have been "permanently domiciled" in Miami.  No employee is "permanently domiciled" in Port of Spain.

These workers, who live on a permanent basis in Florida, work out of Trinidad an average of ten days out of a twenty-eight-day "roster period," and do not necessarily work in Trinidad during every twenty-eight-day roster period.  Indeed, crews change from month to month, and are labelled by Amerijet as "transient."  Thus, a crew might work out of Port of Spain for ten days in one month, but fly from bases within the United States for the entirety of the next two or three months.

---

[8] Port of Spain is the capital of Trinidad and Tobago, and it is located on the island of Trinidad.

18

In March of 2010, IBT filed several grievances against Amerijet concerning Amerijet's operation in Port of Spain.[9] The Systems Board deadlocked in November of 2010. IBT requested arbitration and the parties scheduled arbitration in August of 2011.

Richard Garcia, a former Amerijet employee represented by IBT, filed a separate grievance to challenge his termination based on events that took place in Port of Spain. In March of 2011, the Systems Board deadlocked, and that grievance was also advanced to arbitration.

On April 27, 2011, Amerijet informed IBT that it considered its facility in Port of Spain to be a "permanent foreign base" and thus outside the scope of the CBAs. Amerijet refused to advance Garcia's grievance to arbitration. In addition, Amerijet stated that it was applying the "permanent" designation retroactively, such that it was canceling the scheduled arbitration relating to the March 2010 grievances.

## B. Procedural Background

---

[9] IBT grieved whether Amerijet had properly characterized the Port of Spain operation as a temporary base. As clarified by IBT at oral argument, IBT was not seeking designation of Port of Spain as a "permanent" base. Rather, IBT challenged the categorization of the Port of Spain facility as a "temporary" base as it related to certain compensation issues.

19

In Counts II and III of the complaint, IBT sought to compel arbitration of the March 2010 grievances and Richard Garcia's grievance (collectively, the "Port of Spain grievances").

IBT contended that the Port of Spain grievances were "the very sort of factual and contractual dispute that the parties intended to present to arbitration – indeed, are required to present to arbitration under the RLA – and an order compelling Amerijet to arbitrate is most appropriate."

However, Amerijet argued that the employees "temporarily domiciled in [Port of Spain] are engaged in purely foreign flying . . . and are therefore outside the reach of the RLA." Thus, in Amerijet's view, the district court lacked subject-matter jurisdiction to compel arbitration. Accordingly, Amerijet moved to dismiss Counts II and III of the complaint, pursuant to Rule 12(b)(1) and Rule 12(b)(6).

In the alternative, Amerijet moved for summary judgment, contending that "the grievances at issue concern matters expressly outside the scope of the collective bargaining agreements." Specifically, Amerijet argued that the "Counts II and III . . . are disputes pertaining to Amerijet's operations which by express and negotiated agreement of the parties are outside the scope of the CBAs."

The CBAs provide, in relevant part:

D.    Foreign Bases

20

1. Temporary foreign bases may be opened by the Company upon thirty (30) days written notice to the Union.  The filling of vacancies at temporary foreign bases will be done in accordance with Section 16 of this Agreement.

2. Permanent foreign bases, as designated by the company, may be opened by the Company at any time, without notice, and shall not be covered by the scope of this Agreement.

E.    Scope

1. This Agreement covers the Company and all present and future United States registered/certificated airline subsidiaries of the Company.  Except as otherwise set forth in this Agreement, all present and future flying (including . . . international flying which originates or terminates [a] at a temporary foreign base or [b] within the United States or its possessions) on United States registered/certificated aircraft operated by the Company ("U.S. aircraft") shall be performed by [pilots] on the Amerijet [pilot's] System Seniority List in accordance with the terms and conditions of this Agreement.

Citing these provisions, Amerijet argued that, "[b]ased upon the undisputed facts[,] . . . the grievances at issue concern matters expressly outside the scope of the collective bargaining agreements.  More specifically, because 'permanent foreign bases' are expressly excluded from the scope of the collective bargaining agreements, and the IBT failed to appeal Amerijet's designation of the [Port of Spain] hub as a permanent foreign base[,] . . . the March 2010 grievances concerning the status of the [Port of Spain] hub as a temporary or permanent 'domicile/base' do not constitute minor disputes within the contemplation of 45 U.S.C. § 184."

21

As noted above, the district court granted Amerijet's motion to dismiss and dismissed Counts II and III for lack of subject-matter jurisdiction. The district court reasoned that "a fundamental canon of statutory construction . . . [is that] 'legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States'" (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S. Ct. 575, 577 (1949)). The district court found that the RLA includes no clear expression of congressional intent for its provisions to apply extraterritorially, and that "the grievances in Counts II and III involve exclusively foreign transportation taking place in Port of Spain."

IBT timely appealed.

## C. Analysis

On appeal, IBT argues that the district court erred as a matter of law in finding that it lacked subject-matter jurisdiction over the Port of Spain grievances based on the court's finding that compelling arbitration of those grievances would amount to the extraterritorial application of the RLA. IBT contends that the employees' "connection to Trinidad is at best tangential; it is the United States where they reside, where they work, and from which their working conditions are governed through the parties' agreements."

### 1. Error in finding the application of the RLA a jurisdictional issue

22

As a threshold matter, the district court erred in finding that the question of extraterritoriality was an issue of subject-matter jurisdiction. In *Morrison v. National Australia Bank Ltd.*, the Supreme Court held that, to the extent that a question is raised concerning the extraterritorial application of a statute, it is a merits question rather than a question of subject-matter jurisdiction. 561 U.S. 247, 254, 130 S. Ct. 2869, 2877 (2010). As Amerijet concedes in its brief on appeal, "the U.S. Supreme Court's 2010 decision in *Morrison* . . . now dictates the analysis to be applied in deciding the extraterritorial application of a U.S. law, and further holds that such questions are on the merits."

Accordingly, the district court placed the wrong label on its order of dismissal when it based the latter on the absence of subject-matter jurisdiction, pursuant to Rule 12(b)(1). Instead, any dismissal here should have been characterized as being made on the merits, pursuant to Rule 12(b)(6). And because our reading of the district court's analysis indicates that the latter would have rendered the same decision, regardless of the label placed on that ruling, we now examine the extraterritorial issue on its merits. *Cf. id.* ("[N]othing in the analysis of the court[ ] below turned on the mistake, [and] a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion.") Indeed, as to the extraterritoriality issue, Amerijet on appeal states the facts are

23

undisputed and argues that "this Court should remand Counts II and III to the District Court with instruction to enter summary judgment in Amerijet's favor on these Counts."[10]

## 2. Application of the RLA

At oral argument, Amerijet conceded that the RLA applies while its employees are flying from the United States to Port of Spain, and while they are returning from Port of Spain to the United States.

However, Amerijet argues that the RLA does not apply extraterritorially and that, therefore, the terms of the RLA and the CBAs do not apply to its employees for the ten days during which they work out of Amerijet's facility in Port of Spain. Amerijet contends that, during these ten-day periods, its employees are engaged in "purely foreign flying" between Port of Spain and other destinations in the Caribbean—and therefore, the RLA ceases to apply, and the CBAs, formed under the auspices of the RLA, are unenforceable as to events occurring during these ten-day periods. Notably, "purely foreign flying" is not a term used by the RLA,

---

[10] Because we conclude Amerijet is not entitled to summary judgment on the basis of the extraterritoriality issue, *see infra* Part III.C.2, we deny Amerijet's request to direct the district court to enter summary judgment for Amerijet. Rather, we remand for further proceedings consistent with the legal rulings in this opinion.

but instead is a term used by Amerijet to describe the activities of crews temporarily stationed in Port of Spain.

We begin our analysis by recognizing the "'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Morrison*, 561 U.S. at 255, 130 S. Ct. at 2877 (quoting *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S. Ct. 1227, 1230 (1991) (quotation marks omitted)). Thus, there is a presumption against the extraterritorial application of federal statutes, which "can be overcome only by clear expression of Congress' intention to extend the reach of the relevant Act beyond those places where the United States has sovereignty." *Nieman v. Dryclean U.S.A. Franchise Co.*, 178 F.3d 1126, 1129 (11th Cir. 1999); *see also Arabian Am. Oil Co.*, 499 U.S. at 248, 111 S. Ct. at 1230 ("We assume that Congress legislates against the backdrop of the presumption against extraterritoriality . . . unless there is the affirmative intention of the Congress clearly expressed." (quotation marks omitted)). Put another way, the "canon provides that when a statute gives no clear indication of an extraterritorial application, it has none and reflects the presumption that United States law governs domestically but does not rule the world." *Kiobel v. Royal*

25

*Dutch Petroleum Co.*, 569 U.S. ___, ___, 133 S. Ct. 1659, 1664 (2013) (citations, quotation marks, and brackets omitted).

The relevant question here, however, is not whether the RLA has extraterritorial application. It does not. Rather, we must ask whether the district court was correct that it would be applying the RLA extraterritorially by compelling arbitration of the Port of Spain grievances.

A law is applied extraterritorially if a court "extend[s] its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Foley Bros.*, 336 U.S. at 285, 69 S. Ct. at 577.

In this case, IBT's complaint seeks to compel arbitration based on the arbitration requirement in the collective bargaining agreements. Although certain items in the collective bargaining agreements might embody particular provisions of the RLA, Amerijet has cited no statutory provision of the RLA that mandates that air carriers must arbitrate deadlocked grievances or even that air carriers must enter into a collective bargaining agreement that requires arbitration. Accordingly, the arbitration mandate *being litigated in this particular case* stems from the collective bargaining agreements. In addition, the collective bargaining agreements at issue were executed in the United States between an American employer and an American union, which represents employees domiciled in the

26

United States.  And generally speaking those employees spend the vast majority of their work time engaged in flights from or to United States destinations.

Furthermore, in declarations Amerijet filed alongside its motion to dismiss, the company's representatives admitted that, "[a]t all times since the establishment of the [Port of Spain] hub[,] all of Amerijet's crewmembers have been permanently domiciled in Miami."  Additionally, aircraft based in Port of Spain have "been crewed using rotating transient flight crews that are *temporarily assigned* or 'domiciled'[11] *for short durations* to the [Port of Spain] hub" (emphasis added).  Those durations averaged only ten days during twenty-eight-day roster periods.  And, as clarified at oral argument, crew members do not necessarily work from Port of Spain every roster period, so crew members might spend only ten days in Port of Spain during the course of two or three months.

Considering these facts as admitted by Amerijet in the district court and on appeal, we hold as a matter of law that ordering arbitration would not constitute the extraterritorial application of the RLA in this particular case.  It is the

_____

[11] To the extent that Amerijet attempts to characterize this dispute as an extraterritorial one by labeling the employees as being "temporarily . . . domiciled" in Port of Spain, the attempt is without merit.  Regardless of Amerijet's word choice, an individual's singular domicile under federal law is the place where the individual most recently both (1) was physically present and (2) had the purpose of making that place their permanent home.  *See State of Texas v. State of Florida*, 306 U.S. 398, 424, 59 S. Ct. 563, 576 (1939).  Accordingly, the temporary nature of the employees' presence in Port of Spain and the permanent nature of their residence in Florida, as admitted by Amerijet, establish that Port of Spain was never a domicile for the employees.

27

contractual agreement between the parties that is being applied here. A contract by which Amerijet agreed to be bound is being applied according to its terms: to allow arbitration. The arbitrator will decide if the provisions of the collective bargaining agreements applied to the aggrieved employees. A federal court's order requiring an American employer and American employees represented by an American union to arbitrate a dispute regarding the application (and scope) of collective bargaining agreements does not constitute the extraterritorial application of the RLA merely because the parties entered into the bargaining agreements in accordance with the RLA and some of the employees' flights were between foreign destinations for the relatively short duration of ten days within a twenty-day roster period. Whether the collective bargaining agreements even cover these American workers during those ten-day temporary assignments is a merits question for the arbitrator to decide, and the presumption against extraterritoriality does not prevent a federal court from compelling arbitration of these disputes, arising from these facts.

Stated another way, if Amerijet wants to preclude arbitration for employees who work intermittently in Port of Spain, it can negotiate to do so as part of its collective bargaining agreements. But any extraterritoriality implications arising from an agreement will be driven by the agreement's terms. It is up to the

28

arbitrator to decide what the current collective bargaining agreements say on this and all terms.

We also note that IBT does not seek to have the court apply substantive rights created by a federal statute to employees' work overseas. *Cf. Arabian Am. Oil Co.,* 499 U.S. at 246-47, 259, 111 S. Ct. at 1229-30, 1236 (holding that the presumption against extraterritorial application of federal statutes prevented an employee fired from work being done in Saudi Arabia from sustaining an anti-discrimination action brought under Title VII), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 109, 105 Stat. 1071, *as recognized in Fray v. Omaha World Herald Co.*, 960 F.2d 1370, 1376 (8th Cir. 1992). Rather, IBT asks the court to compel arbitration to determine whether Amerijet violated the terms of the collective bargaining agreements it signed with IBT. Whether the collective bargaining agreements govern Amerijet's employees' work at the Port of Spain facility is a question for the arbitrator to decide by interpreting the CBAs, and not a question for the federal courts.

**3. Amerijet's Motion to Dismiss Under Rule 12(b)(6) or, in the alternative, for Summary Judgment**

Finally, we return to Amerijet's request that we "remand Counts II and III to the District Court with instruction to enter summary judgment in Amerijet's favor

29

on these Counts." Although the district court erred in finding that compelling arbitration of Counts II and III would constitute the extraterritorial application of the RLA, we now turn to whether we can affirm the entry of judgment in Amerijet's favor on alternative grounds.

Specifically, we consider Amerijet's contract-based argument that "Counts II and III . . . are disputes pertaining to Amerijet's operations which by express and negotiated agreement of the parties are outside the scope of the CBAs." As in *Wiley*, the scope of our review is limited to whether IBT's argument—that the dispute remains subject to arbitration—is "so plainly unreasonable" that "it can be seen in advance that no award to the Union could receive judicial sanction." *Wiley*, 376 U.S. at 555, 84 S. Ct. at 917.

To the extent that Amerijet contends that the employees bringing the grievances in Counts II and III were engaged in "purely foreign flying" that is not covered by the CBAs, we conclude that IBT's argument in favor of arbitrability of that CBA issue is not "so plainly unreasonable" that "it can be seen in advance that no award to the Union could receive judicial sanction." *See id.* Therefore, whether the "international flying" provision applies to the types of disputes at issue in the Port of Spain grievances—and whether the employees were engaged in such "purely foreign flying"—are questions for the arbitrator to decide.

30

Similarly, to the extent that Amerijet argues that its classification of the Port of Spain facility as a permanent foreign base and its declaration that the designation applied retroactively removed the grievances from the scope as the CBAs, we find again that IBT's argument in favor of arbitrability is not "so plainly unreasonable" that "it can be seen in advance that no award to the Union could receive judicial sanction." *See id.* It is at least arguable that the provision allowing Amerijet to designate facilities as permanent foreign bases outside the scope of the CBAs does not permit the company to cancel or deny arbitration for grievances whose relevant events occurred prior to that designation.[12] Accordingly, the arbitrator must decide whether the grievances in Counts II and III fall outside the scope of the CBAs for Amerijet's asserted reasons.

In summary, as to Counts II and III, we hold that the district court erred in determining that it lacked subject-matter jurisdiction to compel arbitration of IBT's grievances related to Amerijet's operations in Port of Spain. As to the merits of the extraterritoriality issue before us, we conclude that compelling arbitration here does not apply the RLA extraterritorially. Finally, we conclude that Counts II and III of IBT's complaint (1) were not subject to dismissal on the

---

[12] IBT's alleged failure to bring a separate grievance to challenge the classification is a procedural issue that Amerijet may raise as a potential defense before the arbitrator. *See supra* Part II.C & n.6.

31

merits under Rule 12(b)(6) for failure to state a claim for the relief of arbitration, and (2) were not subject to summary judgment in favor of Amerijet.

### III.CONCLUSION

For the foregoing reasons, we reverse the district court's October 17, 2012 order granting Amerijet's "Motion to Dismiss Pursuant to Rule 12(b)(1) and (6) or, in the Alternative, for Summary Judgment" as to Counts I, II, and III.  We remand this case to the district court for further proceedings consistent with this opinion.[13]

**REVERSED AND REMANDED**.

---

[13] We recognize that, on appeal, IBT asks not only for a reversal of the district court's dismissal order but also that we remand with instructions that the district court enter an order compelling arbitration as to Counts I, II, and III. In the district court, Amerijet filed a motion to dismiss, but IBT did not file a motion to compel arbitration in response.  Before us, the case stands dismissed on Amerijet's motion, and we do not have a procedural vehicle on appeal to grant the relief requested in IBT's complaint and its appeal brief.  Thus, on remand, IBT will need to make the necessary motion in the district court.