# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 16-30116

———————

United States Court of Appeals
Fifth Circuit

**FILED**

February 24, 2016

Lyle W. Cayce
Clerk

JUNE MEDICAL SERVICES, L.L.C., on behalf of its patients, physicians, and staff, doing business as Hope Medical Group for Women; BOSSIER CITY MEDICAL SUITE, on behalf of its patients, physicians, and staff; CHOICE INCORPORATED OF TEXAS, on behalf of its patients, physicians, and staff, doing business as Causeway Medical Clinic; JOHN DOE 1; JOHN DOE 2,

      Plaintiffs – Appellees,

v.

DOCTOR REBEKAH GEE, In her official capacity as Secretary of the Louisiana Department of Health and Hospitals,

      Defendant – Appellant.

———————————

Appeal from the United States District Court
for the Middle District of Louisiana

———————————

Before CLEMENT, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

June Medical Services, L.L.C., and other plaintiffs sought an injunction against the enforcement of Louisiana's statutory requirement that each physician who performs outpatient abortions must have admitting privileges at a nearby hospital. After a bench trial, the district court held that the admitting-privileges requirement was facially unconstitutional and enjoined enforcement of the law against Plaintiffs. The district court denied Louisiana's requests for a temporary stay and a stay pending appeal, and

No. 16-30116

Louisiana immediately filed in this court an emergency motion to stay the district court's preliminary injunction pending the resolution of Louisiana's appeal. We GRANT the motion for a stay pending appeal.

## I.

On June 12, 2014, the Governor of Louisiana signed into law Act 620, which in relevant part amended Louisiana's abortion laws to require that physicians performing abortions must "[h]ave active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services." The Unsafe Abortion Protection Act of 2014 La. Sess. Law Serv. Act 620 (H.B. 388).[1]

The Act was scheduled to go into effect on September 1, 2014. Plaintiffs[2] filed this lawsuit on August 22, 2014, arguing that the Act violated

---

[1] The law amended by Act 620 was La. R.S. § 40:1299.35.2, which was subsequently recodified as La. R.S. § 40:1061.10. We refer to the challenged admitting-privileges requirement in all its forms as the Act.

[2] Plaintiffs-Appellees are abortion providers in Louisiana. June Medical Services, L.L.C., doing business as Hope Medical Group for Women (Hope), is an abortion clinic in Shreveport. Bossier City Medical Suite (Bossier) is an abortion clinic in Bossier City. Choice Incorporated of Texas, doing business as Causeway Medical Clinic (Causeway), is an abortion clinic in Metairie. John Doe 1 is a physician in Family Medicine and Addiction Medicine who performs abortions at Hope. Doe 1 has not obtained admitting privileges within thirty miles of Hope. John Doe 2 is an obstetrician-gynecologist who performs abortions at Bossier and Causeway. Doe 2 has not obtained admitting privileges within thirty miles of Bossier but has obtained conditional privileges at a hospital within thirty miles of Causeway.

The other two abortion clinics in Louisiana are Women's Health Care Center, Inc. (WHCC) and Delta Clinic of Baton Rouge, Inc. (Delta), which operate in New Orleans and Baton Rouge, respectively. John Doe 5 is an obstetrician-gynecologist who performs abortions at WHCC and Delta. He has obtained admitting privileges within thirty miles of WHCC but not within thirty miles of Delta. John Doe 6 is an obstetrician-gynecologist who performs abortions at WHCC. Doe 6 has not obtained admitting privileges within thirty miles of WHCC. WHCC, Delta, Doe 5, and Doe 6 filed a separate complaint and motion for preliminary injunction, but voluntarily dismissed their claims after they were consolidated with the instant lawsuit.

The other two physicians in Louisiana who perform abortions have not been part of this lawsuit. John Doe 3 is an obstetrician-gynecologist who is the medical director of Hope

their and their patients' procedural and substantive due process rights and seeking injunctive relief.[3] The district court issued a temporary restraining order which permitted the Act to go into effect but exempted Plaintiffs from being subject to the Act's penalties and sanctions for practicing without the relevant admitting privileges while they continued to seek those admitting privileges.

Ten months later, the district court conducted a six-day bench trial. Seven months thereafter, the district court issued findings of fact and conclusions of law, followed by entry of judgment two weeks later in favor of Plaintiffs.[4] The district court first found that the Act passed rational basis review because it was rationally related to a legitimate state interest.

The district court then applied the two-part undue burden test announced in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, which asks whether a regulation has the purpose or effect of placing an undue burden on a woman's access to abortion. 505 U.S. 833, 877 (1992). As to the first prong, the district court found that Plaintiffs had not established that the Act has an improper purpose under existing precedent. On the second prong, however, the district court concluded that the Act "will have the effect of placing an undue burden on (i.e. placing a substantial obstacle in the path of) a large fraction of Louisiana women of reproductive age seeking an abortion." *June Med. Servs., LLC v. Kliebert*, No. 14-cv-525, 2016 WL

---

and performs abortions there. He has admitting privileges at two hospitals within thirty miles of Hope. John Doe 4 is an obstetrician-gynecologist who performs abortions at Causeway, but he does not have admitting privileges within thirty miles of Causeway.

[3] Plaintiffs sued the Secretary of the Louisiana Department of Health and Hospitals in her official capacity, which is another way of suing Louisiana itself. *See, e.g.*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."). We refer to Defendant-Appellant as Louisiana.

[4] The temporary restraining order was extended through these proceedings and was in effect for approximately eighteen months.

## No. 16-30116

320942, at *48 (M.D. La. Jan. 26, 2016). On the basis of these findings, the district court declared the Act to be unconstitutional and entered a judgment enjoining enforcement of the Act as to Plaintiffs.

The day judgment was entered, Louisiana appealed the injunction and moved the district court to stay its judgment pending appeal and to temporarily stay the judgment. The district court denied the temporary stay that afternoon and denied the motion to stay pending appeal six days later. Louisiana immediately filed in this court an emergency motion to stay the injunction pending appeal. That motion is now before this panel.

## II.

We note as a preliminary matter that the physician plaintiffs have standing to assert the rights of their prospective patients. The Supreme Court has held that physicians who perform abortions satisfy the test for third-party standing even when they are not threatened with immediate prosecution under state abortion regulations. *Singleton v. Wulff*, 428 U.S. 106, 117–18 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973). At least one of the physicians here—Doe 1—has third-party standing because he has not obtained admitting privileges and may be subject to criminal prosecution for violating the Act;[5] because "doctors who perform abortions share a sufficiently close relationship with their patients"; and because "a pregnant woman seeking to assert her right to abortion faces obvious hindrances in timely . . . bringing a lawsuit to fruition." *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott* (*Abbott II*), 748 F.3d 583, 589 (5th Cir. 2014) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004)). Because Doe 1 has standing to challenge the Act, we need not determine whether Doe 2 or the clinics suffer an "actual or imminent, not 'conjectural' or 'hypothetical'"

---

[5] La. R.S. §§ 40:1061.10, 40:1061.29.

4

injury and have standing as well. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).[6]

We consider four factors in deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott* (*Abbott I*), 734 F.3d 406, 410 (5th Cir. 2013) (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)), *application to vacate stay denied*, 134 S. Ct. 506 (2013). "A stay 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Id.* (quoting *Nken*, 556 U.S. at 427).

## III.

We begin by considering whether Louisiana has made a strong showing that it is likely to succeed on the merits. We conclude that it has.

## A.

We have twice considered facial challenges to a nearly identical admitting-privileges requirement recently enacted in Texas.[7] We first considered whether a stay of the district court's injunction against the requirement was appropriate. Because we concluded that Texas was likely to succeed on the merits by showing the plaintiffs had not proven the requirement placed an undue burden on women seeking an abortion, we stayed the injunction. *Abbott I*, 734 F.3d at 416. When we considered the

---

[6] We noted in *Abbott II* that "there may be a point at which the doctor's interests begin to conflict with his patients. For example, the doctor's economic incentives regarding the performance of abortions may not always align with a woman's right to choose to have an abortion." 748 F.3d at 589 n.9.

[7] The Texas law required that a physician performing an abortion have admitting privileges at a hospital within thirty miles of the location the abortion is performed. *Abbott I*, 734 F.3d at 409.

same lawsuit on its merits, we reversed the district court and permitted the law to go into effect because the plaintiffs had not demonstrated that the law placed an undue burden on a large fraction of women. *Abbott II*, 748 F.3d at 590.[8]

The Supreme Court's jurisprudence on abortion regulation is complicated. When the Court first recognized the right to access to abortion, it concluded that the "right of privacy, whether it is founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action [or] in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153 (1973). In *Casey*, the Court affirmed "the essential holding of *Roe v. Wade*" while rejecting *Roe*'s trimester framework and replacing it with a test based on viability of the fetus. *Casey*, 505 U.S. at 874, 876. After the point in a pregnancy where the fetus is likely viable if born, the state may regulate the provision of abortions to protect its interest "in protecting fetal life or potential life." *Id.* Before viability, the state may regulate abortion provided that the "state regulation [does not] impose[] an undue burden on a woman's ability" to decide whether to carry her child to term. *Id.* at 874. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. In *Gonzales v. Carhart*, the Court added that the state must have a rational basis for its regulation.

---

[8] We also recently considered a lawsuit challenging Mississippi's admitting-privileges requirement. *Jackson Women's Health Organization v. Currier*, 760 F.3d 448 (5th Cir. 2014). In *Jackson Women's Health*, we held only that Mississippi's regulation was "unconstitutional as applied" to the plaintiff clinic, which was the only abortion clinic in Mississippi. 760 F.3d at 450. By contrast, the present challenge seeks, as the challenge considered in *Abbott I* and *Abbott II* sought, facial invalidation.

550 U.S. 124, 158 (2007) (allowing regulations "where [the state] has a rational basis to act, and it does not impose an undue burden").

In our recent cases considering abortion regulations, we acknowledged that states have important interests in protecting the integrity and ethics of the medical profession and in protecting the health of women seeking abortions. *Abbott I*, 734 F.3d at 413. We reiterated the Supreme Court's command that "the fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id.* at 413 (quoting *Casey*, 505 U.S. at 874). In *Abbott II*, we made clear that the burden falls on the plaintiffs to show a regulation unduly burdens a large fraction of women. 748 F.3d at 598. At this stage of the litigation, we must consider whether Louisiana is likely to succeed on the merits by showing that Plaintiffs have not met their burden.

**B.**

Plaintiffs have brought only a facial challenge to the Act.[9] "Such a challenge 'impose[s] a heavy burden upon the part[y] maintaining the suit.'" *Abbott I*, 734 F.3d at 414 (quoting *Gonzales*, 550 U.S. at 167). *Gonzales* recognized "diverging views as to 'what that burden consists of in the specific context of abortion statutes.'" *Id.* at 414 (quoting *Gonzales*, 550 U.S. at 167). In *Barnes v. Mississippi*, we followed "standard principles of constitutional adjudication" that "require courts to engage in facial invalidation only if no possible application of the challenged law would be constitutional." *Abbott II,*

---

[9] In their complaint, Plaintiffs asked the district court to "declare [the Act] unconstitutional under the Fourteenth Amendment to the United States Constitution." In their proposed findings of fact, Plaintiffs wrote that they "seek a preliminary injunction against [the Act] in all of its applications. In other words, Plaintiffs seek facial relief." Plaintiffs now characterize the district court's injunction order as a grant of as-applied relief, but in that very document the district court wrote, "Plaintiffs state emphatically that they are not making an 'as-applied' challenge and that their only challenge is facial."

748 F.3d at 588 (citing *Barnes v. Mississippi*, 992 F.2d 1335, 1342 (5th Cir. 1993)); *accord United States v. Salerno*, 481 U.S. 739, 745 (1987) (In a facial challenge, "the challenger must establish that no set of circumstances exist under which the Act would be valid."). In *Casey*, however, the controlling plurality held that an abortion regulation would be invalid if "in a *large fraction of the cases* in which [it] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. at 895 (emphasis added). In its most recent consideration of an abortion regulation, the Court recognized both standards and declined to choose between them because the law at issue was permissible under either standard. *Gonzales*, 550 U.S. at 167–68 ("We need not resolve that debate."). As in *Abbott I* and *Abbott II*, we do the same here and "apply the 'large fraction' nomenclature for the sake of argument only, without casting doubt on the general rule." *Abbott II*, 748 F.3d at 588–89; *see also Abbott I*, 734 F.3d at 414. Even assuming *arguendo* that the test from *Salerno* and *Barnes* is not binding on this panel, which we do not suggest, Louisiana has a strong likelihood of success in showing that Plaintiffs have failed to establish an undue burden on women seeking abortions under the less-strenuous large-fraction test.

The district court concluded that the Act has a rational basis and that Louisiana did not have an improper purpose in passing the Act. *June Med. Servs.*, 2016 WL 320942, at \*47. We agree and Plaintiffs do not challenge these findings. Louisiana, therefore, need only demonstrate a strong likelihood of success in establishing that Plaintiffs did not prove that the Act has the effect of placing an undue burden on a large fraction of women who could otherwise seek an abortion absent the Act. *See Abbott I*, 734 F.3d at 414. Application of the large-fraction test to the evidence before us supports Louisiana's position that the evidence at trial was insufficient to show that a

large fraction of women seeking abortions would face an undue burden because of the Act.

The district court concluded that the Act imposed an undue burden based on *sua sponte* statistical analyses. First, the district court subtracted the number of abortions performed by physicians who have admitting privileges (5,500) from the total number of women of reproductive age in Louisiana (938,719) and divided the result by the total number of women of reproductive age in Louisiana, concluding that the Act will leave 99% of Louisiana women unable to get an abortion. Second, in the alternative, the court divided the number of abortions performed in clinics that may have to close because the physicians in those clinics do not yet have admitting privileges at a hospital within thirty miles[10] by the total number of abortions performed in Louisiana (9,976). The district court first concluded that only Doe 5 would continue to provide abortions (2,950)[11] in Louisiana and that, as a result, 70% of women would lack access to an abortion. In the alternative, the district court concluded 55% of women would lack access if only Doe 3 (1,500) and Doe 5 continue to provide abortions. Only as a final alternative did it conclude that 45% of women seeking an abortion may lack access if Doe 2 (1,000), Doe 3, and Doe 5 continue to offer abortions. *June Med. Servs.*, 2016 WL 320942, at *38.

---

[10] If the district court is correct that the Act's implementation will result in the closure of those clinics where no physician currently has admitting privileges at a hospital within thirty miles, then Bossier and Delta will close. Bossier is located in Bossier City, approximately six miles from the clinic in Shreveport (Hope), which will not be forced to close as a result of the Act. Delta is located in Baton Rouge, approximately seventy-eight miles from the clinic in New Orleans (WHCC), which will not be forced to close as a result of the Act. The clinic in Metairie (Causeway) also will not be forced to close as a result of the Act.

[11] We note that neither Doe 5 nor the clinic in which he works testified as to his capacity. The district court reached Doe 5's capacity based on the testimony of Doe 3. *June Med. Servs.*, No. 3:14-cv-525, 2016 WL 617444, at *9 (M. D. La. Feb. 16, 2016).

No. 16-30116

Louisiana is likely to succeed in showing that these calculations are neither sufficient nor sufficiently reliable for Plaintiffs to establish an undue burden on a large fraction of Louisiana women. We begin with the district court's conclusion that the Act deprives 99% of Louisiana women of access to an abortion. This calculation is misleading because it does not actually measure the effects of the Act. According to the district court's methodology, 99% of Louisiana women had no access to an abortion before the Act was passed and 99% of Louisiana women will have no access to an abortion after the Act goes into effect.[12] *Abbott I* makes clear that the limited capacity that may exist before a regulation is passed cannot be ascribed to that regulation as part of the large-fraction analysis. 734 F.3d at 415. In prior cases, we have faulted plaintiffs for using an incorrect denominator in their attempts to establish that a large fraction of women are unduly burdened;[13] here the district court erred by using an incorrect numerator. These two errors produce the same absurd outcome—they "always result[] in a large fraction." *Lakey*, 769 F.3d at 299.

We next examine the district court's alternative statistical finding that the Act would deprive 70% of Louisiana women actually seeking an abortion of access to one. The district court reached this percentage by assuming that

---

[12] According to the district court's equation, before the Act, 98.937% of women in Louisiana had no access to abortion (because only 9,976 of the 938,719 women of reproductive age in Louisiana received an abortion). After the Act, according to the district court's equation, 99.521% of women in Louisiana would have no access to abortion (because only 5,500 of 938,719 women of reproductive age in Louisiana could receive an abortion). Using this methodology, the Act affects only 0.584% of Louisiana women of reproductive age—certainly not a large fraction.

[13] *See, e.g., Whole Woman's Health v. Lakey*, 769 F.3d 285, 299 (5th Cir.) ("Plaintiffs argue that the appropriate denominator in the large faction analysis consists only of women 'who could have accessed abortion services in Texas prior to implementation of the challenged requirements, but who will face increased obstacles as a result of the law.' To narrow the denominator in this way—to essentially only those women who Plaintiffs argue will face an undue burden—ignores precedent."), *vacated in part*, 135 S. Ct. 399 (2014).

Doe 5 will be the only abortion provider in Louisiana after the Act takes effect. This assumption is contrary to the undisputed evidence that Doe 3 and Doe 2 *already have* admitting privileges that satisfy the Act. The district court erroneously excluded them because Doe 3 suggested, in hypothetical terms, that he might close his practice and because Doe 2 continues to challenge Louisiana's admission that his privileges satisfy the Act. The district court erred by excluding Doe 2 and Doe 3 on these bases. Doe 3's testimony that he may close his practice if he is the last provider in the state is purely hypothetical. Furthermore, Doe 3's hypothetical decision to close his practice would result from his own choice rather than the requirements of the Act. Because he has admitting privileges that satisfy the Act, the district court should not have assumed in its calculations that the Act would cause him to cease providing abortions. *See Abbott II*, 748 F.3d at 599 (describing doctors' decisions to leave Texas for New York and to stop performing abortions out of concern for future legislation as "entirely unrelated to" the challenged abortion regulation); *Abbott I*, 734 F.3d at 415 (noting that the "many factors other than the hospital-admitting-privileges requirement [that] would affect the availability of physicians to perform abortion," including the proximity of several doctors to retirement age, should not be part of the analysis).

When, in the alternative, the district court contemplated only Doe 5 and Doe 3 continuing to practice, the court calculated that 55% of women seeking an abortion may be affected. This calculation, too, is fatally flawed because it presumes that Doe 2's conditional privileges do not satisfy the Act's requirement of "active admitting privileges." La. R.S. § 40:1061.10.

11

No. 16-30116

Louisiana has repeatedly conceded that Doe 2's conditional privileges[14] satisfy the Act's requirements. Indeed, Louisiana's Secretary of the Department of Health and Hospitals—the state official charged with enforcement of the Act—has entered an affidavit affirming the validity of Doe 2's privileges. It would be improper for this court or the district court to presume to instruct Louisiana on the proper application of its laws. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). Because Louisiana confirms that Doe 2's conditional admitting privileges satisfy the Act, we accept for purposes of this motion that Doe 2 can continue to perform abortions. Therefore the district court's conclusion that 55% of women seeking abortions may lack access is baseless.

Finally, we consider the district court's approach assuming that if only Does 2, 3, and 5 continue to practice, 45% of women seeking an abortion may lack access. Plaintiffs did not introduce expert testimony to support the district court's many alternate large-fraction conclusions. Plaintiffs' expert offered no specific testimony as to the number or location of women who would potentially be affected. The actual calculation was performed by the district court based on raw numbers drawn from disparate testimony. Louisiana's uncontroverted expert testimony demonstrates that, even if Does 2, 3, and 5 are the only abortion providers in the state, well more than 90% of Louisiana women will live within 150 miles of two operating clinics. *See, e.g.,* *Abbott I,* 734 F.3d at 415; *Abbott II,* 748 F.3d at 597–98. Louisiana also

---

[14] Tulane Medical Center has granted Doe 2 privileges to admit "patients from the physician's clinical practice with complications of first and second trimester abortions with referral of those patients to an attending physician on the Tulane staff credentialed for OB/Gyn privileges who has agreed to provide for such care for the physician's patients." *June Med. Servs.,* 2016 WL 320942, at *29.

contests the district court's conclusions on other grounds, suggesting: (1) the district court incorrectly discounted evidence that the physicians who have admitting privileges can perform substantially more abortions than they currently do; and (2) the district court failed to account for the significant number of women who travel to Louisiana to receive an abortion and may not be relevant to the large-fraction analysis. Louisiana ultimately argues that as few as 9.7% of Louisiana women seeking an abortion may lack access under the Act.[15]

Puzzlingly, in their response, Plaintiffs do not seriously contest Louisiana's criticisms of the district court's *sua sponte* calculations. Likewise, they fail to grapple with this court's prior precedent upholding similar admitting-privileges requirements against facial challenges.[16] This is so even though Plaintiffs sought and were granted additional time to respond. Instead, Plaintiffs argue that the large-fraction test, which is the basis for the injunction they ask us to uphold, is "irrelevant."[17]

---

[15] To the extent that Plaintiffs rely on the specific concerns of a subset of Louisiana women seeking abortions, those concerns are more properly the subject of an as-applied challenge. *See Gonzales*, 550 U.S. at 167 ("[An as-applied challenge] is the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances [the challenged law would create an undue burden]."); *Abbott II*, 748 F.3d at 604–05 ("Facial challenges impose a '"heavy burden" upon the parties maintaining the suit' because there is often too little evidence to show that a particular condition has in fact occurred or is very likely to occur. That is the case here. We follow in the Supreme Court's footsteps by noting that in an as-applied challenge, which is the proper means of challenging the lack of an exception to the regulations at issue, 'the nature of the medical risk can be better quantified and balanced than in a facial attack.'") (citing *Gonzales*, 550 U.S. at 167).

[16] Plaintiffs emphasize in their brief that the Supreme Court is about to hear oral argument in *Whole Women's Health v. Hellerstedt*, No. 15-274. The questions presented in that case involve the proper role in *Casey*'s undue burden test of the state's interest and purpose in promoting health as they relate to the effects of a law regulating abortions. Those issues are not implicated here, where the district court found—and the parties do not contest on appeal—that Louisiana's interest in protecting women is legitimate and the purpose of the Unsafe Abortion Protection Act is proper.

[17] Plaintiffs argue the large-fraction test is not relevant because the district court ruled on an as-applied challenge. We disagree. Plaintiffs asked for facial invalidation of the

No. 16-30116

Louisiana is likely to prevail in its argument that Plaintiffs failed to establish an undue burden on women seeking abortions or that the Act creates a substantial obstacle in the path of a large fraction of women seeking an abortion.

**IV.**

For the same reasons as in *Abbott I*, Louisiana has made an adequate showing as to the remaining factors considered in determining whether to grant a stay pending appeal:

> When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws. As the State is the appealing party, its interest and harm merges with that of the public. While we acknowledge that [Plaintiffs have] also made a strong showing that their interests would be harmed by staying the injunction, given the State's likely success on the merits, this is not enough, standing alone, to outweigh the other factors.

*Abbott I*, 734 F.3d at 419 (citations omitted). Nor does the existence of a prior temporary restraining order, designed to allow physicians time to obtain admitting privileges while the Act went into effect, undermine the necessity of the stay.[18] *Cf. Abbott II*, 748 F.3d at 600 (upholding admitting privileges

---

Act at every stage of this litigation. The district court cited the criteria for facial invalidation of a statute and held "[t]he active admitting-privileges requirement of La. R.S. § 40:1299.35.2 is declared unconstitutional as violating the substantive due process rights of Louisiana women seeking abortions." *June Med. Servs.*, 2016 WL 320942, at *53. Finally, the record does not contain the discrete and specific evidence required to maintain an as-applied challenge. We note that our decision today does not foreclose future as-applied challenges. As we observed in *Abbott II*, "the proper means to consider exceptions [to an abortion regulation] is by as-applied challenge." 748 F.3d at 604 (quoting *Gonzalez*, 550 U.S. at 167).

[18] Plaintiffs also argue that we should deny a stay because the Supreme Court "has twice intervened to prevent Texas from shuttering the majority of its abortion facilities during the pendency of litigation and it will hear arguments in that case in two weeks," from which Plaintiffs draw the conclusion that "[t]here is a substantial likelihood that the Supreme Court would reverse any stay granted in this case, for the same reason." Plaintiffs misinterpret both the facts in our prior abortion cases and the Supreme Court's rulings. In *Whole Woman's Health v. Lakey*, 135 S. Ct. 399 (2014), the Court did not stay our ruling on

requirement but prohibiting its enforcement "against abortion providers who applied for admitting privileges within the grace period . . . but are awaiting a response from a hospital").

We have addressed only the issues necessary to rule on the motion for a stay pending appeal, and our determinations are for that purpose and do not bind the merits panel.

It is ORDERED that Louisiana's emergency motion for a stay pending appeal is GRANTED, and the district court's injunction is STAYED until the final disposition of this appeal, in accordance with this opinion.[19]

---

the facial challenge to Texas's admitting-privileges requirement, and for the most part left in place our stay order allowing that requirement to go into effect pending appeal, only vacating our stay as it applied to two clinics. In any event, we have previously explained in regard to this precise order that "no guidance can be gleaned from the Supreme Court's vacating portions of the stay without explanation, as we cannot discern the underlying reasoning from the one-paragraph order." *Cole*, 790 F.3d at 580 (5th Cir. 2015). Moreover, in *Abbott I*, which is the most analogous to the present case, the Supreme Court denied in full the motion to vacate our stay order. *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 134 S. Ct. 506 (2013).

Under our rule of orderliness, we must follow our own precedent absent an intervening change in the law. *Allen v. Stephens*, 805 F.3d 617, 632–33 (5th Cir. 2015). Under our precedent, Louisiana is entitled to a stay pending appeal.

[19] It is further ORDERED that the parties' unopposed motions to place particular exhibits to its emergency stay motion under seal, pursuant to the stipulated protective order entered by the district court, are GRANTED. The merits panel may wish to revisit whether materials under seal should continue to remain under seal, but that issue is beyond the limited scope of this ruling on Louisiana's emergency motion for a stay pending appeal.